## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Michelle Rankin, hereby depose, aver, and state under oath that the following is true:

## ITEMS TO BE SEIZED

1. This affidavit is in support of a criminal and civil seizure warrant for the seizure of the following Subject Property:

   a. Any and all funds up to $195,527.11, from Wells Fargo Bank, N.A., account no. XXXXXX7033, held in the name of Lawrence Anthony Barnett, in the custody of Wells Fargo's Loss Prevention as of July 8, 2015;

   b. Any and all funds up to $370,940, held in Bank of America, N.A., account no. XXXX-XXXX-6109, held in the name of Roberto Cezar Gullattee, in the custody of Bank of America in its Hold Harmless account; and

   c. Any and all funds up to $14,015, held in Bank of America, N.A., account no. XXXX-XXXX-6830, held in the name of Roberto Cezar Gullatte, in the custody of Bank of America in its Hold Harmless account.

## PURPOSE OF AFFIDAVIT

2. Special Agents with the FBI are investigating allegations that Robert Jermaine McCloud ("McCloud") and others conspired to commit a fraud scheme involving two real properties. As will be discussed below, proceeds of the fraud scheme are traceable to the following bank accounts: (a) any and all funds up to $195,527.11, held in Wells Fargo, N.A., account no. XXXXXX7033, held in the name of Lawrence Anthony Barnett; (b) any and all funds up to $370,940.00 held in Bank of America, N.A., account no. XXXX-XXXX-6109, held in the name of Robert Cezar Gullatte; and (c) any and all funds up to $14,015, held in Bank of America, N.A., account no. XXXX-XXXX-6830, held in the name of Roberto Cezar Gullatte (collectively referred to herein as the "Subject Funds"), that have been placed under the custody of the respective financial institutions. As a result, the Subject Funds are subject to civil and

criminal forfeiture because there is probable cause to believe that the Subject Funds are proceeds of conspiracy to commit mail, wire, and bank fraud, in violation of 18 U.S.C. § 1349, mail fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, and bank fraud, in violation of 18 U.S.C. § 1344. To date, the investigation has revealed that: (a) conspirators submitted or caused to be submitted to the District of Columbia's Recorder of Deeds, forged deeds transferring real properties to fictitious names; (b) conspirators used false identifications to open bank accounts in which fraud proceeds were deposited; (c) McCloud appeared as the "seller" at settlement to sign papers to sell the two real properties to third parties; (d) McCloud provided false information to the settlement agents regarding his identity and ownership of the two real properties; (e) after the settlement of the sales of the two real properties, the settlement agents wire transferred $195,271.11, and $384,955, to bank accounts controlled by McCloud and/or other conspirators; and (f) conspirators, including McCloud, withdrew and attempted to withdraw fraud proceeds from the bank accounts.

## AFFIANT'S EXPERIENCE

3.  I am a Special Agent employed by the Federal Bureau of Investigation (FBI). I have been so employed since 1999. Currently, I am assigned to the Asset Forfeiture/ Money Laundering Squad in the FBI's Washington, D.C., Field Division (Northern Virginia Resident Agency). My investigative assignments include investigating the asset forfeiture aspects of suspected violations of numerous federal statutes including but not limited to: federal anti-money laundering statutes (18 U.S.C. § 1956 and 1957), distribution of controlled substances (21 U.S.C. § 841), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and health care fraud (18 U.S.C. § 1347) violations. I have received training in Advanced

Money Laundering Techniques and Complex Financial Manipulation.

4. The information contained in this affidavit is based, in part, on my personal knowledge and observations during the course of this investigation, as well as information provided to me by other law enforcement agents, and is based on a review of various documents and records. Additionally, this affidavit is based upon my training and experience as well as that of other law enforcement agents working with me in this investigation. The dates listed in the Affidavit should be read as "on or about" dates. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of the information about which I, or collectively the other agents involved in this investigation, have knowledge.

## PURPOSE OF APPLICATION AND LEGAL DISCUSSION

5. Special Agents with the FBI and officers with the Metropolitan Police Department ("MPD") have been investigating a fraud scheme believed to have been perpetrated by McCloud and others, in which they obtained proceeds from the sale of two real properties which they did not own or have authority to sell.

6. The investigation revealed that the conspirators used false identifications to facilitate the filing of false deeds of ownership pertaining to two real properties with the District of Columbia Recorder of Deeds, and thereafter sell the same two real properties to third parties. At the closing of the sale of the two real properties, McCloud submitted false identification and provided information about fraudulently opened bank accounts in order to receive the proceeds from the real estate sales to the settlement agents. Based upon the information McCloud provided, the settlement agents wired the sale proceeds from the third party sales to the

fraudulently opened bank accounts controlled by McCloud.  Thereafter, the conspirators withdrew $58,704.29 of the sale proceeds from the fraudulently opened accounts.  The remaining sale proceeds were restrained by the financial institutions.

7. This affidavit supports an application for a criminal and civil seizure warrants for the Subject Property.  The Subject Property may be seized because it is subject to criminal forfeiture to the United States government under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(2), and is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), based on probable cause to believe that the Subject Property is property, real or personal, which constitutes, or is derived from proceeds traceable to the offenses of mail fraud, wire fraud, bank fraud, and a conspiracy to commit those offenses.

8. Thus, the application for a seizure warrant is based on probable cause to believe that the Subject Property is proceeds of:  a conspiracy, in violation of 18 U.S.C. § 1349; a mail fraud scheme, in violation of 18 U.S.C. § 1341; a wire fraud scheme, in violation of 18 U.S.C. § 1343; and a bank fraud scheme, in violation of 18 U.S.C. § 1344.

9. Because the Subject Property is subject to forfeiture to the United States, it is subject to civil seizure pursuant to 18 U.S.C. § 981(b), and criminal seizure pursuant to 21 U.S.C. § 853(f).

10. Authority for issuing a seizure warrant in this judicial district is found at 18 U.S.C. § 981(b)(3) and 28 U.S.C. § 1355(b)(1)(A), which provide that a forfeiture action may be brought in any district in which any of the acts or omissions giving rise to the forfeiture occurred.  Because acts and omissions relating to the fraud schemes could be brought in this District, a forfeiture action may also be brought here.

11. Pursuant to 18 U.S.C. § 981(b)(3), the execution of a seizure warrant may occur in any jurisdiction in which the property is found. The provision states in pertinent part:

> Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found. . . .

## BACKGROUND AND PROBABLE CAUSE

12. Bank of America, N.A., and Wells Fargo Bank, N.A. were financial institutions with deposits insured by the Federal Deposit Insurance Corporation.

13. After settlement of a sale of real property located in the District of Columbia, a title company would submit the Deed and Deed of Trust or other security instruments for filing with the District of Columbia's Recorder of Deeds with instructions that the Recorder of Deeds officially record the documents in the public records and then return to the title company the stamped recorded documents as proof that the documents were filed.

14. The investigation revealed that McCloud, under the alias of Lawrence Anthony Barnett, posed as the owner of XXXXXXXxxxxxx, Washington, DC ("XXXXXXX property") in order to sell the real property to a third party. In addition, the investigation revealed that McCloud using the alias, Roberto Cezar Gullattee (spelling variation also seen as Gullatte), posed as the owner of XXXXXXXXXXX, Washington, DC 20012 ("XXXXXX property") in order to sell the real property to a third party.

15. Records from the District of Columbia Recorder of Deeds show that since February 26, 1972, the XXXXXX property was owned by Latinee G. Gullattee and Alyce C. Gullattee.

16.     Records from the District of Columbia Recorder of Deeds demonstrate that since November 22, 1982, the XXXXXXX property had been owned by Louis E. Barnett and Shirley A. Barnett.

### The Scheme to Defraud

17.     From on or about January 14, 2015, until on or about July 28, 2015, in the District of Columbia and elsewhere, conspirators devised and intended to devise a scheme to defraud, the true property owners of the above-listed two real properties and financial institutions, and to obtain money owned by and under the custody and control of third party property buyers by means of false and fraudulent pretenses, representations, and promises.

### The Purpose of the Scheme to Defraud

18.     It was the purpose of the conspiracy and the scheme to defraud for the conspirators to fraudulently obtain money from the third party property buyers for their own personal use and benefit.

### Manner and Means of the Scheme to Defraud

It was part of the scheme to defraud that:

### XXXXXXX Property

19.     On or between January 14, 2015, and on or about June 11, 2015, conspirators using false identification, purported to transfer ownership of the XXXXXXX property to Lawrence Anthony Barnett (hereinafter referred to as "Barnett"), and shortly thereafter, sell the property to a third party buyer for $225,000.

20.     On or about January 14, 2015, conspirators filed or caused to be filed with the District of Columbia Recorder of Deeds, a Deed purporting to be an "Intra-Family Transaction"

6

of the XXXXXXX property from the owners, husband and wife, Louis Barnett and Shirley A Barnett to Lawrence A. Barnett, as sole owner of the property for no consideration.

21. The Maryland notary listed on the 'Intra-Family Transaction" had the first name of "Taryn." The last name of the notary was difficult to decipher on the document, but appeared to be Baker or Butler. A search was conducted of the Maryland Office of the Secretary of State for any notary named Taryn Baker or Butler. No such notary was found. In fact, Maryland records revealed no notaries in the State of Maryland with the first name of Taryn.

22. On or about May 9, 2015, a conspirator using the name Lawrence Anthony Barnett signed a contract to sell the XXXXXXX property to "JGC" ("third party buyer") for $225,000.

23. On or about May 19, 2015, an individual believed to be McCloud appeared for settlement of the sale of the XXXXXXX property to the third party buyer at "LTC," located in the XXXXXXXXXXXXXXXXX, Washington. McCloud provided the settlement agent with a false California drivers' license with a picture of McCloud, but with the name of "Barnett." McCloud using the "Barnett" alias signed the Settlement Statement and other documents, including an "owner's affidavit," which contained materially false information. "Barnett" also provided the settlement agent with information pertaining to a fraudulently opened bank account where he instructed the sale proceeds to be deposited.

24. Records at the DC Recorder of Deeds demonstrate that a Deed was filed on or about May 21, 2015, showing the sale between Barnett and the third party buyer of the XXXXXXXx property. The Deed was purportedly signed by "Barnett" and he warranted that he was the owner of the property. The Deed was stamped with a request for the District of

Case 1:16-mj-00201-GMH   Document 1-1   Filed 03/03/16   Page 8 of 14

Columbia Recorder of Deeds to, "AFTER RECORDING MAIL TO: "LTC" . . . ."

25. On or about May 20, 2015, an employee of "LTC" caused the sale proceeds from the XXXXXXXxx property, $195,527.11, to be wired from its account to the account provided by "Barnett." That account was opened by a co-conspirator under the alias "Barnett" at Wells Fargo Bank, N.A. ("Wells Fargo") account no. XXXXXX7033 (Wells Fargo account no. xxxx7033).

26. Bank records reveal that on or about May 15, 2015, an individual posing as "Barnett" opened Wells Fargo account no. xxxx7033, with a $50 deposit. "Barnett" used California driver's license number xxxx7343, to open the account. "Barnett" listed his current address in the XXXXXXXXXXXXXxxxxx Street, Silver Spring, Maryland. "Barnett" also listed a previous address in Los Angeles, California, which was the same address listed on the false drivers' license used to open the account.

27. A check of California Department of Motor Vehicles' information revealed that the driver's license number used by the individual representing himself as "Barnett," was issued to a female in Bakersfield, California, who did not have the name "Barnett."

28. A review of bank records revealed that other than the $195,527.11 wire transfer from "LTC," the only other deposit transaction into "Barnett's" Wells Fargo account was the $50 used to open it. Between May 20, 2015 and May 22, 2015, conspirators withdrew approximately $43,001.29, from Wells Fargo account no. xxxx7033.

29. An employee of Wells Fargo determined that the named individual holder of Wells Fargo account no. xxxx7033, "Barnett," provided a social security number to open the account which did not match the account holder, "Barnett." On July 8, 2015, as a result of its

8

investigation, Wells Fargo's Loss Prevention removed the remaining funds from Wells Fargo account no. xxxx7033, in the amount of $152,560.82, and took the funds into its custody to prevent further loss. As of February 3, 2016, $152,560.82 in funds were still in the custody of Wells Fargo Loss Prevention.

30. A review of Wells Fargo bank photographs taken at the time of some of the withdrawal transactions appear to show McCloud making the withdrawals from Wells Fargo account no. xxxx7033.

31. On June 5, 2015, an individual identifying himself "Barnett" called "LTC" and spoke with one of the employees regarding the remainder of the funds. "Barnett" alleged that he had been told by someone at Wells Fargo that the funds were returned to "LTC." "Barnett" was told that he could provide another account number where the funds could be wired.

32. Based upon the investigation, law enforcement agents were able to determine that the information provided by McCloud regarding "Barnett" was false and that he used another individual's social security number to open his account at Wells Fargo.

33. On or about June 10, 2015, one of the true owners of the XXXXXXX property was shown a known photograph of McCloud. The owner denied knowing McCloud -- the individual in the photograph. In addition, the owner stated that McCloud did not have the right to sell the property.

34. On or about June 11, 2015, McCloud appeared at "LTC's" office in the District of Columbia in order to obtain the remaining funds from the sale of the XXXXXXX property. McCloud was met by MPD officers and arrested for fraud. Discovered on McCloud's person at the time of his arrest were two drivers' licenses with his picture, but the names of other

9

individuals, specifically, "Barnett" and "Guillette."

### **XXXXXXXX Property**

35. On or between May 22, 2015, and on or about June 11, 2015, conspirators using false identification, purported to transfer the ownership of the XXXXXX property into the name of Roberto C. Gullattee (hereinafter referred to as "Gullattee") and shortly thereafter sell the property to a third party buyer for $400,000.

36. On or about May 22, 2015, a Deed was filed with the District of Columbia Recorder of Deeds relating to the XXXXXXXXX property. The Deed was labeled an "Intra-Family Transaction," and purported to transfer the XXXXXXXXX property from joint tenants Latinee G. Gullattee and Alyce C. Gullattee, to a sole owner, "Gullattee." The Deed stated that no consideration was provided for the alleged transfer.

37. The Maryland notary listed on the 'Intra-Family Transaction" had the first name of "Taryn." The last name of the notary was difficult to decipher on the document, but appeared to be Baker or Butler. A search was conducted of the Maryland Office of the Secretary of State for any notary named Taryn Baker or Butler. No such notary was found. In fact, Maryland records revealed no notaries in the State of Maryland with the first name of Taryn.

38. On or about May 20, 2015, a conspirator signed "Gullattee's" name to an Agreement to Sell the XXXXXXXXX property for $400,000.

39. As part of the documents submitted to the settlement company, "CTC", an individual purporting to be "Gullattee" signed a Certification For No Information Reporting On The Sale or Exchange Of A Principal Residence. The information on the form falsely alleged,

among other things, that the XXXXXXXXX property had been "Gullattee's" primary residence for at least two of the past five years.

40. On or about June 4, 2015, the sale of the XXXXXXXXX property to a third party buyer was settled. McCloud appeared at the settlement as the seller, using the "Gullattee" alias. A review of the Settlement Statement ("HUD-1") shows that "Gullattee" was to receive $384,955 for the sale. In addition, a review of the HUD-1 shows that the third party buyer of the XXX XXXXX property obtained a loan of over $737,000, to purchase, renovate, and make improvements to the property.

41. McCloud provided to the settlement agent, a copy of a California drivers' license in the name of Gullatte (sic). A comparison of "Gullattee's" drivers' license photograph and McCloud's Maryland drivers' license photograph appear to show the same individual in each photograph.

42. A check of California Department of Motor Vehicles information revealed that the driver's license number used by the individual representing himself as "Gullattee" was issued to a female located in Pasadena, California, not named "Gullattee".

43. A review of the relevant bank records show that on or about June 5, 2015, an individual purporting to be "Gullattee" opened Bank of America ("BOA") account nos. XXXX-XXXX-6109 ("BOA account no. xxxx6109") and XXXX-XXXX-6830 ("BOA account No. xxxx6830") at a branch in Bethesda, Maryland. When opening the accounts, "Gullattee" provided BOA with an address in the XXXXXXXXXXXXX, Silver Spring, Maryland -- the same address that "Barnett" provided to Wells Fargo.

44. The records at the DC Recorder of Deeds show that a Deed was filed on or about

11

June 5, 2015, showing the sale of the XXXXXXXXX property between "Gullattee" and the third party buyer. The Deed was purportedly signed by "Gullattee" and he warranted he was the owner of the XXXXXXXXX property. The Deed was stamped with a request for the District of Columbia Recorder of Deeds to, "AFTER RECORDING MAIL TO: "CTC" . . . .Owings Mills, Maryland. . ."

45. On or about June 8, 2015, $384,955.00 was deposited via wire transfer to "Gullattee's" BOA account no. xxxx6830 from CTC's account. On or about June 9, 2015, a cash withdrawal in the amount of $5,000 posted to "Gullattee's" BOA account no. xxxx6830. Again on or about June 10, 2015, another cash withdrawal in the amount of $5,000 posted to BOA account no. xxxx6830.

46. On or about June 10, 2015, "Gullattee" transferred $370,940.00 in funds from his BOA account no. xxxx6830 to his other BOA account, account no. xxxx6109. On or about June 11, 2015, $5,000 was withdrawn and posted to "Gullattee's" BOA account no. xxxx6109.

47. On or about June 10, 2015, "Gullattee" issued check no. 93 on BOA account no. xxxx6109, made payable to "RB" in the amount of $350,000. The memo line of the check reads, "Investment CCC Project prop purchase." Check no. 93 was deposited into BOA account no. xxxx0329, held in the name of "RB" and posted to the account on or about June 18, 2015. On or about June 19, 2015, a withdrawal in the amount of $303 posted to BOA account no. xxxx0329. Also on or about June 19, 2015, a BOA employee became wary of the large deposit to a new account and returned the funds to "Gullattee's" BOA xxxx6109. On or about June 22, 2015, a withdrawal transaction in the amount of $450 was posted to "RB's" BOA account no. xxxx0329, leaving the account with a negative balance.

48.     On or about June 23, 2015, "Gullattee" issued a different check, check no. 94, in the same amount of $350,000 from his BOA account no. xxxx6830, which was deposited into "RB's" BOA account no. xxxx0329.  Check no. 94 was dated June 10, 2015, and made payable to "RB" with a memo line that read, "Investment CCC Project prop purchase."  On or about June 24, 2015, BOA returned the funds to "Gullattee's" BOA account no. xxxx6109.  BOA subsequently restrained "Gullattee's" account no xxxx6109.   On or about July 28, 2015, BOA transferred the funds in "Gullattee's" BOA account nos. xxxx6830 and xxxx6109, into its Hold Harmless account pending further legal orders.

49.     In summary, of the $384,955 in funds that were initially deposited into "Gullattee's" BOA account no. xxxx3830, $370,940 of those funds were transferred to "Gullattee's" BOA account no. xxxx6109 account, leaving $14,015 of the real property sale proceeds in BOA account no. xxxx3830.   "Gullattee" made two attempts to transfer $350,000 of the real property sale proceeds into "RB's" BOA account no. xxxx0329.  Those funds were returned to "Gullattee's" account and were then subsequently restrained by the bank.  At the time of restraint, the account balance of "Gullattee's" BOA account no. xxxx6109 was $365,920.  The balance on his BOA account no. xxxx6830 was $4,000.21.

**Factual Misrepresentations**

50.     As part of his scheme to defraud, McCloud and his conspirators made materially false statements and misrepresentations in, and provided materially false Deeds to the District of Columbia Recorder of Deeds, and in settling the sales of the two real properties with the third party buyers.  Among the materially false statements, misrepresentations, and false documentation, McCloud provided false identification, false social security numbers and falsely

13

represented himself the owners of the two properties.

51. As a further part of the scheme to defraud, McCloud and conspirators made materially false statements and misrepresentations in the documents that he executed at settlement, including affidavits and other documents certifying to the accuracy and completeness of the information provided.

## CONCLUSION

52. For the foregoing reasons, there is reason to believe that the Subject Property constitutes or was derived from proceeds traceable to a conspiracy to commit mail fraud, wire fraud and bank fraud schemes. Thus, I request that the Court issue a seizure warrant allowing law enforcement agents with the Federal Bureau of Investigation to seize the Subject Property.

_____
Michelle L. Rankin, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on this  3rd   day of March 2016, in Washington, D.C.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE